UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| B.K., a minor, through Greg Kroupa, her guardian ad litem, | ) ) ) | CIV. 12-4046-KES |
| Plaintiff, | ) ) ) | |
| vs. | ) ) ) | |
| 4-H, a South Dakota Unincorporated Association; PETER A. NIELSON, individually and in his official capacity as Assistant Director of 4-H Youth Development; ROD GEPPERT, individually and in his official capacity as Brule County Extension 4-H representative; JOHN DOES, of the South Dakota 4-H Livestock Ethics Committee unidentified in any communication from the other Defendants or in the 2011 South Dakota 4-H Division Handbook of the South Dakota Cooperative Extension Service in their individual and official capacities; and MARY DOES, of the South Dakota 4-H Livestock Ethics Committee unidentified in any communication from the other Defendants or in the 2011 South Dakota 4-H Division Handbook of the South Dakota Cooperative Extension Service in their individual and official capacities, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | ORDER GRANTING DEFENDANTS' MOTION TO DISMISS IN PART AND GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION IN PART |
| Defendants. | ) ) | |

Plaintiff, B.K., a minor, through Greg Kroupa, her father and guardian ad

litem, brought suit against defendants, 4-H, Peter Nielson, Rod Geppert, John

Does, and Mary Does[1] in their individual and official capacities, alleging violations of her First, Fourth, Fifth, and Fourteenth Amendment rights under 42 U.S.C. § 1983 after she was banned from participating in 4-H exhibition shows. Defendants move to dismiss B.K.'s claims against 4-H and against Nielson and Geppert in their official capacities, which plaintiff opposes. B.K. moves for a preliminary injunction to enjoin defendants from precluding B.K.'s participation in 4-H and to refrain from interfering with B.K.'s participation in 4-H activities, which defendants oppose. On June 8, 2012, the court conducted a hearing on the motions and allowed the parties to submit supplemental briefs.

## BACKGROUND FACTS

The pertinent facts to this order are as follows:

Greg Kroupa and his wife have four children, all of whom have participated or currently participate in 4-H. Tr. 9:14-15.[2] Two of the children, including B.K., still participate in the Brule County, South Dakota, 4-H program. Tr. 9:15; Tr. 16:17-21. B.K. is currently 16 years old. Tr. 9:17-18. Greg testified that "[t]here's not a more competitive family in the state, let alone in the union, that's been more successful than my children have been at national levels as well as the state competition." Tr. 10:4-7. According to Greg, his family is "the only family in South Dakota that has ever won at a national

_____

[1] Because the John Does and Mary Does were not identified as of the time of the preliminary injunction, B.K.'s claims against these defendants are not addressed in this order.

[2] All citations are to the transcript from the hearing. Docket 32.

2

steer show level in Denver National Western in 2008." Tr. 11:4-5. Beyond 4-H, the family is also involved in breeding animals, which is part of Greg's business. Tr. 11:6-10.

B.K. has been involved with 4-H since she was eight years old. Tr. 43:19-20. She used to be involved with sports, but she had to choose between sports and 4-H. Tr. 43:24-44:5. B.K. testified that she "made the choice to do 4-H, because that's what meant the most to me." Tr. 44:4-5. B.K. is also involved with FFA (Future Farmers of America), FCCLA (Future Career and Community Leaders of America), and FBLA (Future Business Leaders of America). Tr. 44:8-16. The school provides excused absences for 4-H events and congratulates students who do well at 4-H events, but 4-H is not a school-run program. Tr. 17-24. B.K. hopes to take over the family farm and business one day. Tr. 46: 14-16.

Winning a livestock competition sometimes includes a monetary award. For example, a Sale of Champions award can be substantial, such as the $110,000 award that one of Greg's other daughters won at the Sale of Champions in Denver. Tr. 26:24-27:3. In approximately 2009, B.K. won $22,000 at the NAILE Louisville Livestock Show for a reserve champion steer, and she put the $22,000 into her college fund. Tr. 46:7-13. The South Dakota State Fair is a terminal event, meaning that after the animal is shown, it must be sold for slaughter; it may not be used for breeding purposes. Tr. 38:11-18.

The total award at the South Dakota State Fair for a champion animal is the value of the carcass and a $500 cash award. Tr. 26:13-27:3; Tr. 28:11-20.

The South Dakota State Fair took place from September 1 through September 6, 2011, and B.K. participated in the swine event. Tr. 11:11-13:18. One of the pigs that B.K. showed was named Moe, a crossbreed belted barrow. Tr. 13:18-14:25.

The family bought Moe from Aaron Cooper, who trades in show pig prospects, at a mutual acquaintance's farm in Nebraska. Tr. 39:9-40:6. Neither B.K. nor Greg maintained records of Moe's sale. Tr. 40:15-41:6. B.K. trained Moe to drive by giving him marshmallows as a treat if he successfully completed the exercise. Tr. 13:20-14:4; Tr. 45:21-24; Tr. 55:22-56:13 ("[Y]ou use the term 'driving,' because when you hit him on his jowl, he will move whichever direction you put him in."). Moe received reserve grand honors for the entire 4-H division, and he was the champion market barrow at the FFA show at the fair's conclusion. Tr. 14:9-13.

After the fair, B.K. received e-mails, text messages, and Facebook messages from 4-H members stating that B.K. did not care for Moe, she was a cheater, a liar, and a hypocrite, and she was not a good 4-H leader. Tr. 17:25-18:1; Tr. 47:12-21. B.K. found these messages to be hurtful, and she eventually deleted her Facebook account due to the hurtful messages. Tr. 48:2-5. B.K. told her parents about the comments. Tr. 48:12-19.

4

Greg called Geppert about the harassment. Tr. 18:17-24. Geppert told Greg that he would speak with Nielson and get back to Greg. Tr. 19:6-9. Greg had a phone call with Geppert, and possibly also Nielson, regarding the situation. Tr. 19:10-21:1. Greg testified that the family did not have any other contact with either Geppert or Nielson until the family received a letter dated October 3, 2011, from Nielson. Exhibit 2; Docket 25-1. The letter stated that B.K. was banned from 4-H:

> This letter is to inform you that you will no longer be allowed to participate in South Dakota 4-H exhibition programs. When you enrolled in the South Dakota 4-H program, you and your parent/guardian signed the South Dakota 4-H Code of Conduct Policy and Procedures document agreeing to certain behaviors at all 4-H events and activities (4-H821). The code notified you that those who have been found to have violated the code of ethics "will forfeit premiums and awards and may be prohibited from future exhibitions." The code also required that you as an exhibitor ". . . affirm that . . . [you] . . . have owned and/or cared for . . . your . . . project animal. . . ." It also goes on to say that, "Misrepresentations of ownership, age, identification numbers or facts relating thereto is prohibited." After being shown pictures on September 9, 2011, your father, Mr. Greg Kroupa, admitted to Mr. Rod Geppert and then, to Mr. Peter Nielson that you have not owned or cared for your recent swine entry for the project season. He also admitted that your swine entry had been submitted and competed in this year's Missouri State Fair. The South Dakota 4-H Livestock Ethics Committee met on September 20, 2011 and concluded that you misrepresented the ownership of this animal and violated the code of ethics.
>
> Based on the events surrounding the misrepresentation of ownership of your Reserve Champion Over-all 4-H Market Swine entry, the State 4-H Office has permanently removed you from the South Dakota 4-H exhibition program and any future eligibility or participation in such programs. In addition, you are ineligible to receive any awards of premium monies from the 4-H Swine Project or 4-H Beef Project areas of the 2011 South Dakota State Fair. The South Dakota 4-H program takes the Behavioral Expectations and

5

Code of Conduct outlined in 4-H821 very seriously and does not take this action lightly.

Exhibit 2; Docket 25-1.

In an affidavit, Nielson stated he, along with Geppert, investigated whether B.K. had violated 4-H's ethics. Docket 25 ¶ 4. Nielson maintains that when he "confronted Greg Kroupa, [Greg] admitted the swine had been shown in the Missouri State Fair and that B.K. had not owned or cared for B.K.'s recent swine entry for the project season[.]" Docket 25 ¶ 5.

During the hearing, Greg and B.K. maintained that B.K. cared for Moe, and Greg contended that he did not tell Nielson and Geppert otherwise. Tr. 23:11-24:13; Tr. 50:7-15; Tr. 45:16-20. Greg further asserted that Moe did not compete in the Missouri State Fair. Tr. 24:5-8.

Neither B.K. nor Greg received notification that the Livestock Ethics Committee was going to meet on September 20, 2011. Tr. 24:15-18; Tr. 50:19-51:2. B.K. never received the opportunity to appear before the Ethics Committee, but Greg received a text message from Geppert stating that the matter "was under an Advisory Committee hands[.]" Tr. 24:19-23. After the Ethics Committee made its decision, Greg met with Nielson to determine if a compromise could be reached, and Nielson informed him that the decision was final. Tr. 25:23-26:7. Nielson did not identify the Ethics Committee's members for Greg. Tr. 26:6-12. B.K. has never met Nielson. Tr. 51:9-15.

Dawn Cable is one of B.K.'s 4-H leaders for Brule County. Tr. 58:1-22. Geppert sent Cable a text message stating that B.K. had been banned from

6

shows. Tr. 59:6-60:1. Geppert told Cable to contact Nielson with questions, but she never did. Tr. 59:25-60:3. In her 27 years of experience with 4-H, Cable had never heard of a student being banned from showing animals. Tr. 61:3-5.

While B.K. is banned from showing her animals and participating in events, she is still considered to be a member of 4-H. Tr. 49:13-22. B.K. is also a member of FFA and may attend shows with FFA, but some major shows will not let her show her animals because she is banned from 4-H. Tr. 53:22-54:12 ("[I]f you have been banned from 4-H, even if you are in FFA, you still cannot exhibit.").

## DISCUSSION

### I.    Motion to Dismiss

#### A.    Standard of Review

The local rules require a party to specify "the Federal Rule of Civil Procedure on the basis of which the motion is made." D.S.D. LR 7.1B. In their motion, defendants move to dismiss under Rule 12 but do not specify under which provision of Rule 12 their motion is made. During oral argument, the court asked defendants if they were moving under Rule 12(b)(1). Tr. 99:1-3. Defendants stated that they were making a facial and factual motion under Rule 12(b)(1). Tr. 99:5-19.

Federal Rule of Civil Procedure 12(b)(1) provides that the court may dismiss an action for lack of subject matter jurisdiction. Rule 12(b)(1) "is rooted in the unique nature of the jurisdictional question." *Osborn v. United States*, 918

F.2d 724, 729 (8th Cir. 1990) (quotation omitted). The Court of Appeals for the Eighth Circuit has drawn a distinction between facial and factual 12(b)(1) motions, explaining the applicable standard in each instance. *See id.* at 728-30. Because the court needs to examine the facts to determine jurisdiction, the court will use the Rule 12(b)(1) factual standard, which provides that

> the trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

*Id.* at 730 (quotation omitted). In determining a Rule 12(b)(1) motion, the court may look to evidence outside the pleadings. *Id.* Reviewing outside evidence under Rule 12(b)(1) does not convert the motion into a Rule 56(c) summary judgment motion like reviewing outside evidence does in the context of a Rule 12(b)(6) motion to dismiss or a Rule 12(c) motion for judgment on the pleadings. *Deuser v. Vecera*, 139 F.3d 1190, 1192 n.3 (8th Cir. 1998).

The plaintiff bears the burden to establish that subject matter jurisdiction exists. *V S Ltd. P'ship v. Dep't of Hous. & Urban Dev.*, 235 F.3d 1109, 1112 (8th Cir. 2000) (citing *Nucor Corp. v. Neb. Pub. Power Dist.*, 891 F.2d 1343, 1346 (8th Cir. 1989)). If the court finds that subject matter jurisdiction is lacking, it must dismiss the case. Fed. R. Civ. P. 12(h)(3); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583-84 (1999) (citations omitted).

**B.     Discussion**

Defendants move to dismiss B.K.'s claims against 4-H pursuant to Federal Rule of Civil Procedure 17(b)(3) because 4-H does not have the capacity to sue and be sued. Defendants also move to dismiss B.K.'s claims against Nielson and Geppert in their official capacities under the sovereign immunity doctrine.

**1.     Motion to Dismiss 4-H**

Federal Rule of Civil Procedure 17(b) governs whether an entity has the power to sue and be sued. 4-H is not an individual or a corporation, so Rules 17(b)(1) and (2) do not apply. Instead, Rule 17(b)(3), which covers "all other parties," controls. Rule 17(b)(3) provides that "[c]apacity to sue or be sued is determined . . . by the law of the state where the court is located[.]"

The parties first dispute whether 4-H is a federal or state program. B.K. contends that 4-H is "a federal program run through the State's land grant university." Docket 16 at 1.[3] Defendants assert that "[b]ecause 4-H is a

---

[3] B.K. also argues that "[t]he issue of whether the extension service is part of a land grant college was decided in the case of *Jones v. Erickson*, 244 P 287 (MT 1926) [sic]." Docket 16 at 2. *Jones* determined that under Montana law, the extension service was separate from the agricultural college. 244 P. at 296-97. The statute cited by the court in *Jones* does not have a citation and a 1971 Montana statute concerning the agricultural experiment station differs from the wording cited in *Jones*. Thus, the passage of the 1971 statute may challenge the validity of *Jones*. More importantly, this court must look to South Dakota law, not Montana law, in determining whether 4-H is a state entity. Fed. R. Civ. P. 17(b)(3). The court has reviewed B.K.'s other arguments on this issue and finds them to be unpersuasive.

program of SDSU [South Dakota State University], it is not amenable to suit."
Docket 10 at 2.

In 1862, Congress passed the Morrill Land-Grant Act of 1862. 7 U.S.C.
§§ 301-309. In 1890, Congress passed the Morrill Act of 1890, which is also
known as the Agricultural College Act of 1890. 7 U.S.C. §§ 321-329. Congress
granted "an amount of public land" to the states to be used for land grant
colleges. 7 U.S.C. § 301. South Dakota agreed "to all the provisions of" and the
"terms and conditions" associated with the land grant act. SDCL 13-54-8.
South Dakota designated SDSU as its "land grant" college. SDCL 13-54-1.

In the Smith-Lever Act of 1914, Congress provided that the state land
colleges should be engaged in "[c]ooperative agricultural extension work,"
including educating the public on agriculture and home economics. 7 U.S.C.
§ 342. "Agricultural sciences" includes 4-H clubs. 7 U.S.C. § 3103(9)(L).
Congress provided that the Secretary of Agriculture and the state's land-grant,
agricultural college should mutually agree upon how the program should be
run. 7 U.S.C. § 342. Congress also provided a funding scheme for the extension
program, which each state must match. *See generally* 7 U.S.C. § 343 (providing
the funding scheme for the extension programs).

The South Dakota legislature has stated that SDSU, through the Board
of Regents, will oversee the 4-H program for South Dakota:

> The provisions of an act of Congress entitled, "An Act to establish
> agricultural extension departments in connection with agricultural
> colleges in the several states receiving the benefits of an act of
> Congress," [7 U.S.C. § 341] having been accepted by this state, the

> Board of Regents is authorized and directed to maintain at South
> Dakota State University an extension department for the purposes
> of giving instruction and demonstration in agriculture and home
> economics to persons not attending such university.

SDCL 13-54-1. The South Dakota legislature has further stated that "[i]t shall

be the duty of the Board of Regents of Education to organize and conduct

agricultural extension work as provided by said act of Congress in connection

with other agricultural extension work carried on by the South Dakota State

University." SDCL 13-54-9.

More recently, the South Dakota Attorney General reiterated that "[t]he

South Dakota Cooperative Extension Services operates under the direction of

the South Dakota State University." Hearing Ex. 4. *Re: Federal Law Implications*

*of Budget Cuts to the South Dakota Cooperative Extension Service*, S.D. Atty's

Gen. Op. No. 11-03 (June 17, 2011), 2011 WL 2685583. *Stewards of Progress*[4]

states that the SDSU extension service program provides educational

programming for leaders of 4-H, technological support for all 4-H management

and programs, and a 50 percent time 4-H advisor for counties with 2,500

youth or more. *Stewards of Progress* at 12. SDSU, through its College of

Agricultural and Biological Services, facilitates the 4-H program for South

Dakota.

---

[4] Hearing Ex. 5. College of Agriculture & Biological Sciences, South
Dakota State University, *Stewards of Progress*, SDSU Extension (April 2011),
https://www.sdstate.edu/abs/iGrow/upload/Stewards-of-Progress.pdf
[hereinafter *Stewards of Progress*].

Thus, 4-H is a state program facilitated by SDSU and overseen by the Board of Regents. This conclusion is consistent with the conclusion of other courts that have addressed the issue. *See, e.g.*, *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 552 (2d Cir. 2001) (reasoning that an extension program ran by a land-grant college was "a creature of the state which voluntarily carries out state functions with state encouragement[.]"); *Wade v. Miss. Coop. Extension Serv.*, 424 F. Supp. 1242, 1256 (N.D. Miss. 1976) (reasoning that if the state university and its governing board "are entitled to the protection of the Eleventh Amendment, it is only logical to conclude that [the extension service] is likewise afforded immunity, for [the extension services] is merely an operating division of [the state college] and controlled by the Board." (citing Miss. Cod. Ann. § 37-113-19 (1972))).

Because 4-H is a state entity, South Dakota law determines whether 4-H can sue or be sued. Fed. R. Civ. P. 17(b)(3). There is no South Dakota law stating whether 4-H can sue or be sued. When the state statute is silent on whether a state entity can sue or be sued,[5] then that entity is not amenable to suit under Rule 17(b)(3) and dismissal is appropriate. *See, e.g.*, *Lundquist v. Univ. of S.D. Sanford Sch. of Med.*, No. 09-4147, 2011 WL 5326074, at *5

---

[5] The Board of Regents has the power to sue and be sued under South Dakota law. SDCL 13-49-11. But there is no South Dakota law stating that SDSU has the power to sue and be sued. *See* SDCL 13-58 (containing the statutes related to SDSU but not stating whether SDSU has the power to sue and be sued). The Board of Regents' power to sue and be sued does not extend to SDSU, *Pushkin v. S.D. State Univ.*, No. 10-4108-KES, 2010 WL 5089480, at *2 (D.S.D. Dec. 8, 2010), and, thus, would not extend to 4-H.

(D.S.D. Nov. 4, 2011) (dismissing the action and reasoning that "[n]othing in S.D.C.L. 13–57 gives USD or its medical school the ability to sue or be sued. Rather, the Board of Regents, which controls USD Sanford School of Medicine, has the power to sue and be sued under S.D.C.L. 13–49–11."); *Pushkin v. S.D. State Univ.*, No. 10-4108-KES, 2010 WL 5089480, at *2 (D.S.D. Dec. 8, 2010) (reasoning because "SDSU lacks the capacity to be sued under South Dakota law," dismissal of plaintiff's claims against SDSU was proper); *see also Brown v. Fifth Judicial Distr. Drug. Task Force*, 255 F.3d 475, 476–77 (8th Cir. 2001) (affirming dismissal for failure to state a claim against multi-governmental unit based on the entity's lack of capacity to sue under state law); *Lazarescu v. Ariz. State Univ.*, 230 F.R.D. 596, 602 (D. Ariz. 2005) (affirming the dismissal of a complaint against Arizona State University because it had not been granted the power to sue or be sued); *Rivas v. State Bd. for Cmty. Colleges & Occupational Educ.*, 517 F. Supp. 467, 470 (D. Colo. 1981) (holding that claims against the college council must be dismissed where it was not granted the power to sue and be sued). Thus, defendants' motion to dismiss the claims against 4-H is granted.

### 2.    Motion to Dismiss Nielson and Geppert

Defendants contend that sovereign immunity bars B.K.'s claims against Nielson and Geppert in their official capacities. B.K. responds that "Nielson and Geppert are not state employees for the purposes of" 42 U.S.C. § 1983. Docket 16 at 3.

The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." U.S. Const. amend. XI. Sovereign immunity extends to all entities that are considered arms of the state and state actors in their official capacities. *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429-30 (1997).

The Eighth Circuit and the South Dakota Supreme Court have held that the Board of Regents is a political subdivision of the state and, as such, is entitled to sovereign immunity, meaning that it cannot be sued under § 1983. *See Prostrollo v. Univ. of S.D.*, 507 F.2d 775, 777 n.1 (8th Cir. 1974) (reasoning that "it is fundamental that the University of South Dakota and the corporate body constituting the Board of Regents, both political subdivisions of the state, may not be sued under the Civil Rights Act since neither entity constitutes a 'person' within the meaning of § 1983." (citations omitted)); *Aase v. S.D. Bd. of Regents*, 400 N.W.2d 269, 271 (S.D. 1987) (holding "that the Board of Regents is not a person within the meaning of 42 U.S.C. § 1983 . . . and may not be sued under that section." (citations omitted)); *Kringen v. Shea*, 333 N.W.2d 445, 446 (S.D. 1983) (reasoning that the Board of Regents is entitled to sovereign immunity). The Board of Regents controls SDSU and, thus, SDSU is also entitled to sovereign immunity. *See Prostrollo*, 507 F.2d at 777 n.1 (reasoning that the University of South Dakota, which the Board of Regents controls,

14

cannot be sued under § 1983); *see also Pushkin*, 2010 WL 5089480, at *2 (reasoning that "SDSU lacks the capacity to be sued under South Dakota law[.]"). Officials of a state entity entitled to sovereign immunity are also entitled to sovereign immunity for claims of monetary damages against them in their official capacities. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

Geppert's W-2 tax forms state that "South Dakota State University" is his employer. *See* Docket 30, 30-1. Nielson's W-2 forms were not submitted, but B.K.'s attorney acknowledged that Nielson was most likely a state employee:

> THE COURT: What about Mr. Nielson? Isn't he a state employee?
>
> MR. PEKAS: Mr. Nielson, without any discovery being done in this particular case, Your Honor, I would have to, with the affidavit that was submitted, I would believe that he is a state employee.

Docket 32; Tr. 81:19-23. The referenced affidavit is a letter sent by Nielson on cooperative extension letterhead.[6] Docket 25-1. The mailing, email, and website addresses all list SDSU. Docket 25-1. Nielson is the assistant director for 4-H youth development. Docket 25-1. Thus, it appears that Nielson is a state employee. Because Nielson and Geppert are employed by SDSU and SDSU is entitled to sovereign immunity, Nielson and Geppert are also entitled to sovereign immunity regarding B.K.'s claim for monetary damages against them in their official capacities.

---

[6] All of the letters from 4-H in the record are on a specific letterhead with SDSU's logo in the upper left hand corner and "South Dakota Extension Service" printed to the right of the logo.

The court will next examine whether B.K. can obtain prospective injunctive relief against Nielson and Geppert in their official capacities. In her complaint, B.K. seeks injunctive relief "barring the Defendants from keeping her from full participation in 4-H in good standing." Docket 1 ¶ 42; *see also* Docket 18 at 1 (moving for an injunction to enjoin "Defendants to reinstate [B.K.] and to refrain from interfering with . . . B.K.'s participation in any 4-H activities.").

While defendants in their motion to dismiss do not distinguish between B.K.'s claims for monetary and injunctive relief against Nielson and Geppert in their official capacities, the United States Supreme Court has recognized a distinction. In *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989), the Supreme Court reasoned that "[o]f course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.' " *Id.* at 71 n.10 (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.15 (1985)) (citing *Ex parte Young*, 209 U.S. 123, 159-60 (1908)). "This distinction is commonplace in sovereign immunity doctrine, and would not have been foreign to the 19th-century Congress that enacted § 1983." *Id.* (citations omitted); *see also Randolph v. Rodgers*, 253 F.3d 342, 345 (8th Cir. 2001) ("*Ex parte Young* and its progeny teach that a private party may seek prospective injunctive relief in federal court against a state official, even if the state is otherwise protected by Eleventh Amendment immunity."

16

(citing *Green v. Mansour*, 474 U.S. 64, 68 (1985))). Thus, defendants' motion to dismiss B.K.'s claims for monetary damages from Nielson and Geppert in their official capacities is granted but, to the extent that defendants move to dismiss B.K.'s claims for injunctive relief from Nielson and Geppert in their official capacities, that motion is denied.

## II.   Preliminary Injunction

B.K.'s remaining claims are her claims for injunctive relief against Nielson and Geppert in their official and individual capacities and her claims for monetary damages against Nielson and Geppert in their individual capacities.[7] Only the injunctive relief is at issue in this order.

"A preliminary injunction is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant." *Watkins Inc. v. Lewis*, 346 F.3d 841, 845 (8th Cir. 2003) (citations omitted). The moving party must make the familiar four-part showing before the court issues a preliminary injunction: (1) the threat of irreparable harm by the movant; (2) the balance between this harm and the injury that granting the injunction will inflict on the other parties; (3) the probability that the movant will succeed on the merits;

---

[7]  Defendants did not move to dismiss B.K.'s claims against Nielson and Geppert in their individual capacities. State officials sued in their individual capacities are amenable to suit under § 1983, including claims for monetary damages. *Hafer v. Melo*, 502 U.S. 21, 30-31 (1991). "[S]tate officers are personally liable for their conduct if sued in an individual capacity. In individual-capacity suits, the Eleventh Amendment does not bar compensatory damages, or punitive damages." *Nix v. Norman*, 879 F.2d 429, 433 n.3 (8th Cir. 1989) (citations omitted).

and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). This is a flexible analysis. *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999).

### A.   Success on the Merits

Probability of the success on the merits is a critical factor in determining whether a court should issue a preliminary injunction. *Lankford v. Sherman*, 451 F.3d 496, 507 (8th Cir. 2006). "Probability of success on the merits" means that the moving party must show "a 'fair chance' of success on the merits[.]" *Planned Parenthood of Minn, N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2006) (quoting *Heartland Acad. Cmty. Ch. v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003)). A "fair chance of prevailing" does not require a greater than 50 percent likelihood of prevailing on the merits. *See id.* at 731 (quoting *Dataphase*, 640 F.2d at 113). B.K. bears the burden to prove that she has a fair chance of success in showing that defendants are liable under § 1983 for a violation of her constitutional rights.

Section 1983 provides a civil cause of action against any person who, under color of state law, causes a deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States. 42 U.S.C. § 1983; *McRaven v. Sanders*, 577 F.3d 974, 979 (8th Cir. 2009). B.K. alleges that defendants violated her First, Fourth, Fifth, and Fourteenth Amendment rights. Because the court determines that B.K. has shown she has

a fair chance of succeeding on her procedural due process claim, the court will only address that claim in this order.

B.K. asserts a claim for injunctive relief against Nielson and Geppert in their individual and official capacities. The court will analyze the official capacity claims because the relief that B.K. seeks on her procedural due process claim, the ability to continue participating in 4-H, would be provided in Nielson's and Geppert's official, not individual, capacities.

The Fourteenth Amendment protects against a state depriving an individual of her liberty or property interest without due process of law. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972). Before B.K. can argue that defendants violated her due process rights, she must identify the right at issue. *See id.* In *Roth*, the Supreme Court outlined the requirements for finding a property interest:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vendicate [sic] those claims.

> Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* at 577.

19

During the hearing, B.K.'s attorney argued that "the administrative rules in the State of South Dakota would govern the process involved with whether or not you are going to take away a person's abilities to access Federal benefits." Docket 32; Tr. 89:3-7. B.K.'s attorney also argued that the United States Department of Agriculture or federal Administrative Procedures Act (APA) would provide the right under the due process analysis. Docket 32; Tr. 89:3-90:15. The court allowed B.K. to brief the issue of whether any provision in the APA applies.

In her brief, B.K. argues that the APA applies and must be followed before she can be expelled "from the federal program." Docket 31 at 2; *see also* Docket 32; Tr. 80:8-11 ("I believe this is a Federal program, as the testimony indicated today. That people have a right and privileges under Federal law."). But 4-H is an arm of the state. B.K. cites no precedent stating that the federal APA applies to an arm of the state.[8]

South Dakota has statutory "Administrative Procedure and Rules," SDCL 1-26 (SDAPA), which provides for notice and a hearing in certain circumstances: "In a contested case, all parties shall be afforded an

---

[8] The federal APA likely does not apply to a state entity. *See, e.g.*, *Heard Commc'ns, Inc. v. Bi-State Development Agency*, 18 Fed. App'x 438, 439-40 (8th Cir. 2001) (reasoning that because a bi-state transportation agency was not a quasi-federal agency, the federal APA did not apply to a contract dispute); *Denison v. Kitzhaber*, No. 00-833-BR, 2001 U.S. Dist. LEXIS 12514, at *10-11 (D. Or. July 24, 2001) ("The APA does not create a private cause of action against or a right of review over a state agency or state actors. . . . [T]he APA does not create substantive rights." (citations omitted)).

opportunity for hearing after reasonable notice." SDCL 1-26-16. A "contested

case"[9] is

> a proceeding, including rate-making and licensing, in which the
> legal rights, duties, or privileges of a party are required by law to
> be determined by an agency after an opportunity for hearing but
> the term does not include the proceedings relating to rule making
> other than rate-making, proceedings related to inmate disciplinary
> matters as defined in § 1-15-20, or student academic or
> disciplinary proceedings under the jurisdiction of the Board of
> Regents or complaints brought by students attending institutions
> controlled by the Board of Regents about their residency
> classification under §§ 13-53-23 to 13-53-41, inclusive[.]

SDCL 1-26-1(2).

"Rules of statutory construction require that the Court must read

statutes together and to the extent possible, give effect to all language." *Banner*

*Health Sys. v. Long*, 663 N.W.2d 242, 247 (S.D. 2003). "The purpose of

statutory construction is to interpret the true intention of the law, which is to

be construed primarily from the plain meaning of the statute." *In re Estate of*

*Howe*, 689 N.W.2d 22, 31 (S.D. 2004) (citing *Appeal of AT & T Info. Sys.*, 405

N.W.2d 24, 28 (S.D. 1987)). Thus, the court will construe the statutes by giving

plain meaning to all applicable sections.

### 1.   Exclusionary Language of SDCL 1-26-1(2)

The court first addresses the exclusionary portion of SDCL 1-26-1, which

states that "student academic or disciplinary proceedings under the

---

[9] A "contested case" is "an adjudicatory hearing as opposed to a quasi-legislative or rule making proceeding." *In re Union Carbide Corp.*, 308 N.W.2d 753, 757 (S.D. 1981).

jurisdiction of the Board of Regents" is excluded from the contested case definition.[10] Defendants contends that B.K.'s case falls under this exclusionary language. Docket 34 at 4-5 n.1.

The Board of Regents oversees SDSU, which in turn operates the extension service, which in turn operates 4-H. There is no indication that the Board of Regents oversees either the day-to-day or the disciplinary proceedings of 4-H. Instead, all of the evidence suggests that 4-H is run by a board of directors paid through SDSU and volunteers. *See* Docket 1-3 at 7 (listing 4-H's directors as of 2011); Hearing Ex.1, "South Dakota Youth Development/4-H Behavioral Expectations at County, State and National Events" (containing the rules for events issued by 4-H, printed on 4-H letterhead); *Stewards of Progress* at 1 (stating that the advisory committee members "represent a broad cross-section of county- and state-level Extension experience, as well as Extension experience from other states.").

Defendants argue "that SDSU's Extension Service is under the authority of the Board of Regents and the fact this is a 'disciplinary proceeding' by the Extension Service seems to show the [SDAPA] is inapplicable." Docket 34 at 5 n.1. The Board of Regents does have statutory authority to oversee the 4-H program. SDCL 13-54-1; 13-54-9. But there is no indication in the record that the Board of Regents has jurisdiction over a 4-H disciplinary proceeding.

---

[10] The final clause, addressing complaints brought by students attending institutions controlled by the Board of Regents, is not at issue here.

According to Nielson's letter dated October 3, 2011, the "*South Dakota 4-H Livestock Ethics Committee,*" not the Board of Regents, investigated B.K.'s case "and concluded that [she] misrepresented ownership of this animal [Moe] and violated the code of ethics." Exhibit 2; Docket 25-1 (emphasis added). After receiving that information, the "*State 4-H office* . . . permanently removed [B.K.] from the South Dakota 4-H exhibition program and any future eligibility or participation in such programs." Hearing Ex. 2; Docket 25-1 (emphasis added). Nielson's letter does not state that the Board of Regents participated in either B.K.'s disciplinary proceeding or the decision to ban her from 4-H exhibition programs. There is no indication in the record that the Board of Regents controls 4-H's Ethics Committee.

Moreover, B.K. is not a "student" within the Board of Regents' jurisdiction because she is a not a "student" of a higher education institution controlled by the Board of Regents. Instead, B.K. is a student of a public high school and a *member* of 4-H. B.K.'s only connection to the Board of Regents, that of a 4-H *member*, does not bring her within the ambit of the Board of Regents' jurisdiction because that jurisdiction is limited to "students," and the plain meaning of "student" is not synonymous with the plain meaning of "member."

Defendants argue that even if B.K. is entitled to due process, under the rationale of *Gul v. Center for Family Medicine*, 762 N.W.2d 629 (S.D. 2009), B.K. received due process because she had notice of the Ethics Committee's

23

investigation prior to her expulsion. In *Gul*, the South Dakota Supreme Court reasoned that a hearing was not necessary before the university could dismiss a medical student for academic reasons. *Id.* at 636. Instead, the university only had to notify the student of her academic deficiencies and provide an opportunity for the student to make academic success. *Id.* Because the student did not meet the academic standards, the school could terminate her without affording her due process. *Id.*; *see also Guse v. Univ. of S.D.*, No. Civ. 08-4119-KES, 2011 WL 1256727, at *6-8 (D.S.D. Mar. 30, 2011) (recognizing similar standards for an academic dismissal of a graduate standard).

*Gul* is not persuasive. By its own language, the SDAPA does not apply to the dismissal of a graduate student at an institution under the Board of Regents' jurisdiction. SDCL 1-26-1(1).[11] B.K. is not a student at an institution under the Board of Regents' jurisdiction.

---

[11] Moreover, in *Guse v. University of South Dakota*, No. Civ. 08-4119-KES, 2011 WL 1256727, at *6-8 (D.S.D. Mar. 30, 2011), this court noted that when a university dismisses a student based on alleged ethical violations, that is a disciplinary dismissal. 2011 WL 1256727, at *8. "A university student facing a disciplinary dismissal must receive notice of all allegations against him or her, a definite charge, and an in-person hearing with the opportunity to present his or her side of the story." *Id.* (citing *Jones v. Snead*, 431 F.2d 1115, 1117 (8th Cir. 1970); *Esteban v. Central Mo. State Coll.*, 415 F.2d 1077, 1089 (8th Cir. 1969); *Greenhill v. Bailey*, 519 F.2d 5, 7 (8th Cir. 1975)). If the SDAPA did not apply because the Board of Regents had jurisdiction over B.K.'s dismissal from 4-H, then she was still entitled to notice, a definite charge, and an in-person hearing because B.K.'s exclusion from 4-H events was based on an alleged ethical violation and, therefore, she was entitled to the due process procedures applicable to a disciplinary dismissal. The failure to provide due process is a violation of the Fourteenth Amendment. *Id.* at *9-10.

Thus, the exclusionary portion of SDCL 1-26-1, "student academic or disciplinary proceedings under the jurisdiction of the Board of Regents," does not apply.

### 2.       Remainder of SDCL 1-26-1(2)

Under SDCL 1-26-1(2), a contested case exists for "a proceeding . . . in which the legal rights, duties, or privileges of a party are required by law to be determined by an agency after an opportunity for hearing[.]" SDCL 1-26-1(2). In the SDAPA, agency means "each association, authority, board, commission, committee, council, department, division, office, officer, task force, or other agent of the state vested with the authority to exercise any portion of the state's sovereignty." SDCL 1-26-1(1). This definition is controlling. *Bruggeman v. S.D. Chemical Dependency Counselor Certification Bd.*, 571 N.W.2d 851, 852 (S.D. 1997) ("Where the term 'agency' is defined by statute, the statutory definition is controlling." (citing *Frawley Ranches, Inc. v. Lasher*, 270 N.W.2d 366, 371 (S.D. 1978))).

4-H is an association, board, committee, or agent of South Dakota. Defendants contend that 4-H is entitled to Eleventh Amendment sovereign immunity because 4-H is an arm of the state of South Dakota. Because 4-H is an asociation, board, committee, or agent of the state and is entitled to exercise part of South Dakota's sovereignty, the statutory definition of "agency" has been met.

### 3.   Due Process Provisions of SDAPA

The South Dakota Supreme Court has reasoned that "[t]he principal manifestation of a 'contested case' is its character as a quasi-judicial process based upon particular facts and information, and immediately affecting the interests of specific parties in the proceedings." *In re Union Carbide Corp.*, 308 N.W.2d 753, 757 (S.D. 1981) (quoting *Valley State Bank of Canton v. Farmers State Bank of Canton*, 213 N.W.2d 459, 463 (S.D. 1973)). "The constitutional guaranty of due process of law applies to, and must be observed in, administrative as well as judicial proceedings, particularly where such proceedings are specifically classified as judicial or quasi-judicial in nature." *Id.* at 758 (citation omitted). The South Dakota Supreme Court has long held that " '[d]ue process of law applies to administrative and executive action by which one may be deprived of property[.]' " *Id.* (quoting *Caldwell v. Pierson*, 159 N.W. 124, 126 (S.D. 1916)); *see also id.* at 757 (that "required by law" language in SDCL 1-26-1 "includes constitutional requirements of fair play, due process and agency rules, as well as the requirements of statutory law.' " (citations omitted)).

The SDAPA "provides generally for appointment of a hearing examiner, rules of evidence, oath, subpoena power and deposition evidence. That such procedure is at least quasi-judicial in nature is beyond dispute." *Id.* Thus, the South Dakota Supreme Court has held "that a party thereto is entitled to due process." *Id.*

26

B.K. was an adverse party in the Ethics Committee's hearing because the Committee was determining whether she was entitled to continue her participation in 4-H, which is an agency for purposes of SDCL 1-26-16; 1-26-1(2). While the Board of Regents and SDSU facilitate the cooperative extension program and 4-H, it appears that 4-H maintains the right to discipline its members, including through a hearing before or investigation by the Ethics Committee.

Moreover, the Ethics Committee's actions may have touched upon B.K.'s property and liberty interests. B.K. has been successful in the past at livestock shows. B.K. has earned multiple monetary awards, including a $22,000 award. B.K. has placed the proceeds from her livestock shows into her college fund. B.K. may be excluded from some major shows because she is banned from 4-H. Consequently, she has lost the opportunity to compete for the chance to win future monetary awards, which could be used to fund her college education.

In *Marchand v. Grant County*, No. CV-07-182-RHW, 2009 WL 2998184 (E.D. Wash. Sept. 15, 2009), the district court for the Eastern District of Washington found a liberty interest to participate in a county fair. *Id.* at *5-6. In *Marchand*, the plaintiff, who was involved with 4-H as a trainer and leader, was expelled from the county fairgrounds after she allegedly cursed. *Id.* at *1-3. The court found that the county fair board did not violate her substantive due process rights, but that a jury could find that it violated her procedural due process rights:

27

On the other hand, Plaintiff has a liberty interest in attending the Grant County Fair that requires procedural due process. *See Hodge*, 88 F. Supp. 2d at 1242. . . . In this case, Plaintiff asserts that she was removed from Fair by the Board members without giving her an opportunity to address the allegations that were being levied against her. In order to determine whether Plaintiff's due process rights were violated, the jury will have to consider a number of factors; for instance, the time delay from the confrontation and the decision to expel Plaintiff, whether an emergency situation prevented the Board members from first approaching Plaintiff prior to asking the sheriff officers to remove her from the fair grounds, whether the confrontation disrupted any events that were taking place, or whether the confrontation resulted in some injury to a fair-goer. In viewing the facts in the light most favorable to Plaintiff, the Court finds that a reasonable jury could find that Plaintiff's due process rights were violated when she was expelled from the 2005 Grant County Fair without being afforded an opportunity to present her side of the story.

*Id.* at *5-6. Applying the rationale in *Marchand* to this case, the court finds that B.K. may similarly have a liberty interest to show livestock animals at 4-H events.

The SDAPA also applies if B.K. can show that a "privilege" afforded to her was controlled by 4-H. SDCL 1-26-1(2). A main focus of 4-H is to train and assist its members in preparing to exhibit livestock at various shows. Members have a right or a privilege to participate in these shows as long as they are in good standing with 4-H.

B.K. has shown that she has a fair chance of prevailing on the merits to prove that she has a property and/or liberty interest under the due process clause to attend and participate in livestock shows. B.K. has also demonstrated a fair probability of success to prove that she had a privilege and/or right of

attending and participating in these shows as a member of 4-H under SDCL 1-26-1(2). Because a liberty interest, property interest, and/or privilege is involved and B.K.'s rights to attend and participate in livestock shows was controlled, at least in part, by 4-H (an agency for purposes of SDCL 1-26-1(1), (2)), she is likely entitled to the due process outlined in SDCL 1-26-16, which requires notice and a hearing.

Before banning her from 4-H, defendants only spoke with Greg, B.K.'s father. After that conversation, the Ethics Committee held a hearing on the matter. The Ethics Committee did not provide notice to either B.K. or Greg that they were meeting to discuss B.K.'s continued involvement with 4-H. B.K. did not receive the opportunity to present her side of the story in-person or in writing. B.K. has shown that she was not provided with either notice that the Ethics Committee was going to meet or an opportunity to appear at the hearing before the Ethics Committee or other applicable 4-H committee. These actions may establish a violation of SDCL 1-26-16. Thus, the success on the merits factor weighs in favor of granting the injunction.

**B.     Irreparable Harm**

Of the two most critical *Dataphase* factors, courts heavily weigh the threat of irreparable harm factor. "[T]he movant's failure to sustain its burden of proving irreparable harm ends the inquiry 'and the denial of the injunctive request is warranted.' " *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991) (quoting *Gelco Corp. v. Coniston Partners*, 811 F.2d

414, 420 (8th Cir. 1987)). The key word in the irreparable harm factor is irreparable because "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (internal quotation omitted).

B.K. need only show the possibility of harm and not actual harm. *See, e.g.*, *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) ("The purpose of an injunction is to prevent future violations . . . and, of course, it can be utilized even without a showing of past wrongs." (citing *Swift & Co. v. United States*, 276 U.S. 311, 326 (1928))). But B.K. must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008) (emphasis in original) (citations omitted).

Numerous courts have held that there is no irreparable harm if the plaintiff is denied the opportunity to participate in government-sponsored athletics. *See, e.g.*, *McGee v. Va. High Sch. League, Inc.*, 801 F. Supp. 2d 526, 531 (W.D. Va. 2011) ("Courts have routinely rejected the notion that a student suffers irreparable harm by not being permitted to participate in interscholastic athletics." (citation omitted)); *St. Patrick High Sch. v. N.J. Interscholastic Athletic Ass'n*, No. 10-cv-948, 2010 U.S. Dist. LEXIS 17993, at *16-17  (D.N.J. 2010) (collecting cases and holding that there was no irreparable harm when a high school basketball team was prohibited from playing in the state championship);

30

*Fluitt v. Univ. of Neb.*, 489 F. Supp. 1194, 1201 (D. Neb. 1980) (reasoning that the court had "some difficulty finding irreparable injury to the plaintiff" when he claimed that, among other alleged harms, that he would be denied the opportunity to compete on the university's track team and would be unable to defend his title in the mile race). Defendants claim that participation in 4-H is similar to participation in government-sponsored athletic events.

4-H and athletic activities share some similarities, including the time commitment necessary to excel in the activities and the competitive nature of the activities. Unlike athletic activities, however, 4-H offers its members a chance to win monetary awards, which B.K. has won in the past and has placed in her college fund. B.K. also testified that she hopes to take over the family business in the future, which currently includes breeding and showing livestock. By being banned from 4-H, B.K. loses the opportunity to learn how to show animals. Given these facts, B.K. has shown that she has a possibility of irreparable harm. *See, e.g.*, *Davelaar v. Rock Valley Community Sch.*, No. C98-4003-DEO, 1998 WL 34114577, at *11 (N.D. Iowa Jan. 21, 1998) (reasoning that a student expelled from FFA showed irreparable harm).

B.K. further alleges that she will be irreparably harmed due to "disdain from her contemporaries[.]" Docket 20 at 4. B.K. presented evidence that she received multiple harassing text messages, Facebook messages, and emails from other 4-H members stating that she did not personally care for Moe, she was a cheater, and she was not a good 4-H leader. B.K. terminated her

31

Facebook account due to the harassment. B.K. has shown that she has faced "disdain" from her peers, and her reputation for honesty has been injured. The court finds, after considering all of the evidence, that the irreparable harm factor weighs in favor of granting the preliminary injunction.

### C.   Balance of the Harms

The balance of the harms factor examines the balance between the harm to the party seeking the injunction and the public interest. *Pottgen v. Mo. State High School Activities Ass'n*, 40 F.3d 926, 928-29 (8th Cir. 1994) (citing *Dataphase*, 640 F.2d at 114). Stated another way, the court balances the harms that would result in the following scenarios: (1) if the court improperly denied the preliminary injunction; and (2) if the court improperly granted the preliminary injunction. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (4th Cir. 2002) ("[W]hile cases frequently speak in the short-hand of considering the harm to the plaintiff if the injunction is denied and the harm to the defendant if the injunction is granted, the real issue in this regard is the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is improperly granted or denied[.]"); *Am. Hosp. Supply Corp. v. Hosp. Prods., Ltd.*, 780 F.2d 589, 594 (7th Cir. 1986) (announcing a similar test); *see also Hillerich & Bradsby Co. v. Christian Bros., Inc.*, 943 F. Supp. 1136, 1142 (D. Minn. 1996) (balancing the harms by looking at what the harm to the defendant would be if the injunction were "improperly granted").

If the court improperly grants the injunction, then B.K. will participate in 4-H shows where she has the possibility of winning the show and receiving a monetary award to which she is not entitled. If the court improperly denies the injunction, then B.K. will lose the opportunity to learn about showing livestock and may possibly forfeit monetary prizes. She will also continue to be excluded from some major shows that do not allow banned 4-H members to participate. B.K. is currently 16 years old and has two more years to show livestock with 4-H. Due to the time-consuming nature of litigation, B.K. may be too old to show livestock with 4-H by the conclusion of this case. Thus, the balance of the harms factor weighs in favor of granting the injunction.

### D.    Public Interest

South Dakota has a strong public interest to afford notice and a hearing when appropriate. *See generally* SDCL 1-26 (containing a complex system of required notices and hearings in various circumstances). This interest is especially strong here when B.K. was banned from 4-H on the basis of what her father allegedly told Nielson and Geppert, the validity of which is disputed by her father. B.K. did not receive an opportunity to defend herself or otherwise explain what occurred. Thus, the public interest factor weighs in favor of granting the injunction.

All four factors weigh in favor of granting the preliminary injunction. Plaintiff seeks "a preliminary injunction enjoining the Defendants to reinstate the Plaintiff's ward and to refrain from interfering with the Plaintiff's ward,

B.K.'s participation in any 4-H activities." Docket 18 at 1. Thus, defendants are prohibited from interfering with B.K.'s participation in any 4-H activities until further order of the court.

## CONCLUSION

Defendants move to dismiss all of B.K.'s claims against 4-H and B.K.'s claims against Nielson and Geppert in their official capacities. 4-H is not a legal entity that can sue or be sued and therefore is entitled to be dismissed. Nielson and Geppert, as state employees, are entitled to sovereign immunity under the Eleventh Amendment for B.K.'s claims for monetary relief against them in their official capacities. Thus, defendants' motion to dismiss is granted as to B.K.'s claims for injunctive and monetary relief against 4-H and B.K.'s claims for monetary relief against Nielson and Geppert in their official capacities. It is denied with respect to the request for injunctive relief against Nielson and Geppert in their official capacities. B.K. moves for a preliminary injunction under 42 U.S.C. § 1983 for various constitutional violations. The court only addressed B.K.'s Fourteenth Amendment procedural due process claim asserted against Nielson and Geppert in their official capacities. Because all four of the *Dataphase* factors have been met, B.K.'s motion for a preliminary injunction is granted as to that claim. Accordingly, it is

ORDERED that defendants' motion to dismiss (Docket 9) is granted in part.

IT IS FURTHER ORDERED that plaintiff's motion for a preliminary injunction (Docket 18) is granted in part.

IT IS FURTHER ORDERED that defendants are enjoined from interfering with B.K.'s participation in any 4-H activities until further order of the court.

Dated July 12, 2012.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE